**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSEPH GREGORIO, individually and on behalf of all others similarly situated,

                          Plaintiff,

      v.

PREMIER NUTRITION CORPORATION,

                         Defendant.

Civil Action No. 1:17-cv-05987-AT

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, COSTS, EXPENSES, AND INCENTIVE AWARD

Dated: November 5, 2018

**BURSOR & FISHER, P.A.**

Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com
       pfraietta@bursor.com

L. Timothy Fisher (*Pro Hac Vice*)
Frederick J. Klorczyk III
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
       fklorczyk@bursor.com

**BARBAT, MANSOUR & SUCIU PLLC**

Nick Suciu III (*Pro Hac Vice*)
1644 Bracken Road
Bloomfield Hills, MI 48302
Telephone: (313) 303-3472
Email: nicksuciu@bmslawyers.com

*Class Counsel*

[Supporting Counsel listed on signature page]

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 2

    A.    Plaintiff's Allegations ............................................................................ 2

    B.    The Litigation And Work Performed To Benefit The Class ................... 3

SUMMARY OF THE AMENDED SETTLEMENT ................................................. 7

ARGUMENT ................................................................................................................. 8

I.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND
    SHOULD BE APPROVED .............................................................................. 8

    A.    The Percentage Method Should Be Used To Calculate Fees ................11

    B.    The Reasonableness Of The Requested Fees Is Supported By This
        Circuit's Six-Factor *Goldberger* Test ..................................................12

        1.    Time And Labor Expended By Counsel......................................12

        2.    Magnitude And Complexity Of The Litigation ..........................13

        3.    The Risk Of Litigation................................................................14

        4.    The Quality Of Representation ...................................................15

        5.    The Requested Fee In Relation To The Settlement......................16

        6.    Public Policy Considerations ......................................................16

    C.    The Requested Attorneys' Fees Are Also Reasonable Under A
        Lodestar Cross-Check ...........................................................................17

II.    THE REQUESTED INCENTIVE AWARD REFLECTS MR.
    GREGORIO'S ACTIVE INVOLVEMENT IN THIS ACTION AND
    SHOULD BE APPROVED ..............................................................................21

CONCLUSION..............................................................................................................22

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
  522 F.3d 182 (2d Cir. 2008).................................................................................9, 10

*Asare v. Change Grp. of N.Y., Inc.*,
  2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) .................................................... 20

*Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*,
  2002 WL 1315603 (S.D.N.Y. June 17, 2002)......................................................... 9

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y. 2013)....................................................................20, 21

*Blum v. Stenson*,
  465 U.S. 886 (1984) ............................................................................................ 18

*Bristol-Myers Squibb Co. v. Superior Court of California*,
  137 S. Ct. 1773 (2017).................................................................................. Passim

*Cassese v. Williams*,
  503 F. App'x 55 (2d Cir. 2012)............................................................................ 17

*Castagna v. Madison Square Garden, L.P.*,
  2011 WL 2208614 (S.D.N.Y. June 7, 2011)........................................................ 21

*City of Providence v. Aeropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014).......................................................... 10

*Clark v. Ecolab, Inc.*,
  2010 WL 1948198 (S.D.N.Y. May 11, 2010)........................................................ 10

*Dornberger v. Metro. Life Ins. Co.*,
  203 F.R.D. 118 (S.D.N.Y. 2001).......................................................................... 22

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. Feb. 25, 2014) ........................................................... 15

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ............................................................................................ 17

*Flores v. Anjost Corp.*,
  2014 WL 321831 (S.D.N.Y. Jan. 29, 2014) ....................................................10, 22

*GB ex rel NB v. Tuxedo Union Free School Dist.*,
  894 F. Supp. 2d 415 (S.D.N.Y. 2012) ................................................................. 9

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000) ................................................................. 8, 9, 12, 17

*Hayes v. Harmony Gold Min. Co.*,
  2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) ...................................................... 10

*Hernandez v. Merrill Lynch & Co.*,
  2012 WL 5862749 (S.D.N.Y. Nov. 15, 2012) ................................................... 21

*Hyun v. Ippudo USA Holdings*,
  2016 WL 1222347 (S.D.N.Y. Mar. 24, 2016) ............................................... 11, 20

*In re Beacon Assocs. Litig.*,
  2013 WL 2450960 (S.D.N.Y. May 9, 2013) ...................................................... 11

*In re Citigroup Inc. Sec. Litig.*,
  965 F. Supp. 2d 369 (S.D.N.Y. 2013) ................................................................ 9

*In re Credit Default Swaps Antitrust Litig.*,
  2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) .................................................... 20

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. Oct. 22, 2009) ........................................................ 22

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
  2007 WL 2230177 (S.D.N.Y. July 27, 2007) .................................................... 11

*In re Initial Public Offering Secs. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y.2009) ............................................................... 10

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................. 14, 16

*In re MetLife Demutalization Litig.*,
  689 F. Supp. 2d 297 (E.D.N.Y. 2010) ............................................................. 16

*In re Nasdaq Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................... 13

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) .............................................................. 14

*Khait v. Whirlpool Corp.*,
  2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ................................................... 10

*LeBlanc-Sternberg v. Fletcher*,
   143 F. 3d 748 (2d Cir. 1998) ........................................................................ 18, 19

*Luciano v. Olsten Corp.*,
   109 F.3d 111 (2d Cir. 1997) ............................................................................. 18

*Massiah v. MetroPlus Health Plan, Inc.*,
   2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012) ............................................... 17, 21

*McDaniel v. Cnty. of Schenectady*,
   595 F.3d 411 (2d Cir. 2010) ..................................................................... 8, 12, 20

*McMahon v. Olivier Cheng Catering & Events, LLC*,
   2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) ..................................................... 21

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ......................................................................................... 18

*Monzon v. 103W77 Partners, LLC*,
   2015 WL 993038 (S.D.N.Y. Mar. 5, 2015) ...................................................... 9, 11

*Parker v. Jekyll & Hyde Entm't Holdings, LLC*,
   2010 WL 532960 (S.D.N.Y. Feb. 9, 2010) ........................................................ 21

*Parker v. Time Warner Entertainment Co., L.P.*,
   631 F. Supp. 2d 242 (E.D.N.Y. 2009) .............................................................. 18

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air*,
   478 U.S. 546 (1986) ......................................................................................... 18

*Perdue v. Kenny A. ex rel. Winn*,
   559 U.S. 542 (2010) ......................................................................................... 11

*Price v. L'Oreal USA, Inc.*,
   2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018) ................................................... 16

*Reyes v. Altamarea Grp.*,
   2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) ................................................ 10, 21

*Shapiro v. JPMorgan Chase 7 Co.*,
   2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ................................... 14, 16, 17, 18

*Varljen v. H.J. Meyers & Co., Inc.*,
   2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) ..................................................... 11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ...................................................................... 9, 11, 12, 17

*Willix v. Healthfirst, Inc.*,
　2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) ........................................................................ 10

*Yuzary v. HSBC Bank USA, N.A.*,
　2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013) ....................................................................8, 21

*Zorrilla v. Carlson Restaurants Inc.*,
　2018 WL 1737139 (S.D.N.Y. Apr. 9, 2018) ...................................................................... 10

**STATUTES**

21 U.S.C. § 343(a)(1) ........................................................................................................... 3

28 U.S.C. § 1715 .................................................................................................................. 7

**RULES**

Fed. R. Civ. P. 23(h) ........................................................................................................1, 8

Fed. R. Civ. P. 26 .........................................................................................................3, 5, 12

## INTRODUCTION

In this putative class action, Plaintiff Joseph Gregorio alleges that Defendant Premier Nutrition Corporation ("Premier" or "Defendant") systematically misled consumers by misrepresenting that its ready-to-drink ("RTD") protein products contained 30 grams of protein when, in fact, they did not.  The First Amended Class Action Settlement ("Amended Settlement"), if finally approved, resolves Plaintiff's and the Class' claims against Defendant. The Amended Settlement – preliminarily approved by this Court on September 14, 2018 – creates a $9 million non-reversionary common fund from which class members will receive a *pro rata* cash payment.  Class members with proof of purchase are eligible to receive a cash award subject to a $40 cap and *pro rata* adjustment based on claims volume.  Class members without proof of purchase are eligible to receive a cash award subject to a $20 cap and *pro rata* adjustment.

While resolution was achieved in a relatively short period of time, obtaining the exceptional relief did not come easily.  Rather, Plaintiff shouldered significant risk and battled through hard-fought litigation, involving complex factual investigation into the actual protein content in Defendant's RTD Products (which included commissioning and paying for multiple rounds of independent laboratory testing), case-dispositive motion practice on novel legal issues, and discovery.  When the Parties thought that there was a potential for resolution, they sought the assistance of Martin Quinn, Esq., a well-respected mediator at JAMS.  And the settlement was agreed to as a mediator's proposal by Mr. Quinn.

In light of this exceptional result, Plaintiff respectfully requests, pursuant to Federal Rule of Civil Procedure 23(h), that the Court approve attorneys' fees, costs, and expenses of one-third of the settlement fund, or $3,000,000.00, as well as an incentive award of $5,000 for Plaintiff for his service as class representative.

1

## FACTUAL AND PROCEDURAL BACKGROUND

A brief summary of the litigation performed by Class Counsel for the Settlement Class' benefit, and the beneficial terms of the Settlement provide necessary context to the reasonableness of the requested fees and incentive award.

### A.    Plaintiff's Allegations

Defendant formulates, manufactures, advertises and sells the popular "Premier Protein" branded ready-to-drink ("RTD") protein shakes throughout the United States, including in New York. Plaintiff alleges that Defendant marketed its Products in a systematically misleading manner by misrepresenting that its Products had specific amounts of protein that they did not in fact contain (the "Misrepresentations"). Plaintiff's Second Amended Complaint ("SAC"), ECF No. 50, ¶ 1. Because Defendant's sales are driven by consumers seeking protein supplementation, Defendant prominently displays the total protein content of its Products on the front and back of each product's label. *Id.* ¶ 2. Plaintiff further alleges that Defendant labels and advertises all of its Products in a manner that highlights the amount of added protein contained within. Each Product lists its respective protein content on each Product's front label, directly below the title of the Product, as well as on the back nutritional label. *See* Declaration of Hanny Kanafani ("Kanafani Decl."), ECF No. 74, ¶ 3. Such representations constitute an express warranty regarding the Products' protein content. SAC ¶ 9. Specifically, Defendant's RTD product label plainly states that it is fortified with 30 grams of protein on the front of the packaging and also indicates that there are 30 grams of protein per bottle in the Nutrition Facts section. This "30g protein" representation is identical throughout all of Defendant's RTD products – however, based upon testing commissioned by Plaintiff's attorneys, the RTD Products were only shown to contain between 26.9 grams and 28.34 grams. *Id.* ¶¶ 10-11.

Accordingly, Plaintiff alleges that Defendant's false, deceptive, and misleading label

statements violate 21 U.S.C. § 343(a)(1) and the so-called "little FDCA" statutes adopted by many states, which deem food misbranded when "its labeling is false or misleading in any particular." *Id.* ¶ 13. Defendant's false, deceptive and misleading label statements are unlawful under state Unfair and Deceptive Acts and Practices Statutes and/or Consumer Protection Acts, which prohibit unfair, deceptive or unconscionable acts in the conduct of trade or commerce. *Id.* ¶ 14.

### B.    The Litigation And Work Performed To Benefit The Class

In October 2016, Class Counsel and Supporting Counsel began what would be an over nine-month pre-suit investigation into alleged mislabeling of the protein content of its RTD Products. *See* Declaration of Philip L. Fraietta ("Fraietta Decl.") ¶ 3. While that investigation was ongoing, the United States Supreme Court issued an opinion in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017). *Id.* ¶ 4. Knowing that would potentially impact the litigation, Plaintiff filed his class action lawsuit on August 8, 2017, and Defendant has vigorously defended itself from the outset, including by seizing on that issue. *Id.* ¶¶ 11, 18, 19.

On September 12, 2017, after engaging in a telephonic conference pursuant to Fed. R. Civ. P. 26, Plaintiff served his first set of Requests for the Production of Documents and Interrogatories on Defendant. *Id.* ¶¶ 6-7. On September 18, 2017, Defendant filed a letter requesting adjournment of the Initial Pretrial Conference, an extension of time for Rule 26 initial disclosures and discovery plan, and to stay all discovery pending the Court's decision on Defendant's forthcoming motion to dismiss. *Id.* ¶ 8. That same day, the Court denied Defendant's request to adjourn the Initial Pretrial Conference and for an extension of time for Rule 26 disclosures and a discovery plan, and held that the propriety of a stay can be argued in person at the Initial Pretrial Conference. *Id.*

On October 5, 2017, the Court held an Initial Pretrial Conference and declined to stay discovery. The Court also entered a Civil Case Management Plan and Scheduling Order. *Id.* ¶ 9. On October 6, 2017, Defendant served its first set of Requests for the Production of Documents and Interrogatories on Plaintiff. *Id.* ¶ 10.

On October 16, 2017, Defendant filed a Pre-Motion Letter for its forthcoming Motion to Dismiss. *Id.* ¶ 11. On October 23, 2017, Plaintiff filed his Opposition to Defendant's Pre-Motion Letter for Motion to Dismiss. *Id.* On October 25, 2017, having considered the Parties' pre-motion letters, the Court granted Defendant permission to file its motion to dismiss. *Id.*

On October 19, 2017, Defendant served its Responses to Plaintiff's First Set of Requests for the Production of Documents and Interrogatories. *Id.* ¶ 12. On October 30, 2017, Plaintiff served his Responses to Defendant's First Set of Requests for the Production of Documents and Interrogatories. *Id.* ¶ 13. On November 10, 2017, Defendant began its initial document production. *Id.* ¶ 14Defendant made a subsequent document production on January 5, 2018. *Id.*

In November and December 2017, the Parties engaged in a series of telephonic meet-and-confer calls to narrow the scope of discovery, and negotiate an appropriate protocol for the search for and production of electronically stored information ("ESI"). *Id.* ¶ 15. Class Counsel worked diligently to review Defendant's document productions, and identify key custodians within Defendant's corporate structure. *Id.* ¶ 16. Class Counsel also worked closely with Plaintiff to search for responsive documents, including to perform ESI searches of Plaintiff's email accounts. *Id.* ¶ 17.

While discovery was ongoing, on November 27, 2017, Defendant filed its Motion to Dismiss under Rules 12(b)(1) and 12(b)(6), arguing, *inter alia*, that Plaintiff lacked Article III standing and failed to state a claim upon which relief could be granted. *Id.* ¶ 18. In response to purported deficiencies identified by Defendant's Motion to Dismiss, Plaintiff filed his Amended

Complaint on December 11, 2017. *Id.* On January 2, 2018, Defendant filed its Motion to Dismiss Plaintiff's First Amended Complaint. *Id.* ¶ 19. On January 15, 2018, Plaintiff filed his opposition to Defendant's Motion to Dismiss. *Id.* On January 22, 2018, Defendant filed its reply in support of its motion to dismiss. *Id.*

From the outset of the case and including during the pendency of the motion to dismiss, the Parties engaged in direct communications, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of early resolution. *Id.* ¶ 20. Those discussions eventually led to an agreement between the Parties to engage in private mediation, which the Parties agreed would take place before Martin Quinn, Esq., who is a neutral affiliated with JAMS San Francisco. *Id.* ¶ 21. In preparation for the mediation, Class Counsel and Supporting Counsel reviewed sales figures of Defendant's RTD Products, and drafted a detailed mediation statement outlining the strengths of Plaintiff's case to help evaluate any potential settlement. *Id.* ¶ 22.

The mediation took place on January 22, 2018 at JAMS's offices in San Francisco and lasted approximately ten hours. *Id.* ¶ 23. The Parties engaged in good faith negotiations, which at all times were at arm's length. *Id.* At the conclusion of the mediation, Mr. Quinn made a mediator's proposal to settle the case, which both sides accepted. *Id.*

On January 23, 2018, the Parties notified the Court by joint letter that they mediated before Martin Quinn, Esq., and that the Parties reached an agreement on the material terms of a class action settlement. ECF No. 41. As a result, on January 24, 2018, the Court issued a Memo Endorsement which deferred ruling on Defendant's motion to dismiss. ECF No. 42.

On April 2, 2018, Plaintiff moved for preliminary approval of the Original Settlement. Fraietta Decl. ¶ 25 (citing ECF No. 51). On May 14, 2018, the Court granted Plaintiff's Motion for Preliminary Approval. *Id.* ¶ 27 (citing ECF No. 62).

On May 21, 2018, pursuant to that Order, Class Counsel subpoenaed Sam's Club and Costco for class member identifying data in order to provide direct notice to Settlement Class Members. *Id.* ¶ 28 (citing ECF No. 62 ¶ 13). Class Counsel worked diligently with counsel for both retailers to obtain the data promptly. *Id.* ¶ 29. However, the retailers did not complete their document productions within the time requested. *Id.* Sam's Club made its production on June 15, 2018, and while Costco originally promised to produce that same day, it did not make its production until August 6, 2018. *Id.*; *see also id.* ¶ 32. Thus, on July 5, 2018, the Parties submitted a joint letter to the Court requesting that the Court amend the Preliminary Approval Order to extend the deadlines to disseminate notice. *Id.* ¶ 30 (citing ECF No. 66). On July 10, 2018, the Court issued an Amended Order Granting Preliminary Approval. *Id.* ¶ 31 (citing ECF No. 68).

Thereafter, Class Counsel continued to work diligently with Costco's counsel to obtain its document production. *Id.* ¶ 32. However, Costco did not make its document production until August 6, 2018. *Id.* Upon receiving the data, the Parties, with the Settlement Administrator, analyzed the data produced. *Id.* ¶ 33. That analysis showed that the retailers had produced a greater volume of data than the Parties had anticipated, thus necessitating additional notice costs, primarily due to increased postage for more direct mail. *Id.*

As a result of those additional notice costs, the Parties decided to renegotiate the Original Settlement in an effort to deliver more cash relief to class members. *Id.* ¶ 34. These negotiations resulted in an agreement to shift the settlement from a $9 million hybrid fund, consisting of cash and product vouchers, to a $9 million all-cash fund. *Id.* ¶ 35. The Parties then entered into the First Amended Settlement Agreement on September 7, 2018. *Id.* ¶¶ 36-37.

Additionally, on September 7, 2018, the Parties submitted a joint letter to the Court informing the Court of their agreement to the Amended Settlement, and requesting that the Court

vacate the July 10, 2018 Amended Order Granting Preliminary Approval. *Id.* ¶ 38 (citing ECF No. 69). On September 10, 2018, the Court granted that request. *Id.* ¶ 39 (citing ECF No. 70).

On September 14, 2018, the Court granted Plaintiff's Motion For Preliminary Approval Of The First Amended Class Action Settlement. *Id.* ¶ 41 (ECF No. 77). Since that time, Class Counsel has worked closely with the Settlement Administrator, BrownGreer PLC ("BrownGreer"), to carry-out the Court-ordered notice plan. *Id.* ¶ 46. Specifically, Class Counsel helped compile and review the contents of the required notice to State Attorney Generals pursuant to 28 U.S.C. § 1715, reviewed the final claim and notice forms, reviewed the final press release and internet banner advertisements, and reviewed and tested the settlement website before it launched live. *Id.* Class Counsel has also worked with BrownGreer on a weekly basis to monitor settlement claims and any other issues that may arise. *Id.* ¶ 47. And Class Counsel has also fielded calls from Settlement Class Members and assisted them with filing claims. *Id.*

## SUMMARY OF THE AMENDED SETTLEMENT

Class Counsel's efforts resulted in exceptional relief for the Settlement Class. The Amended Settlement creates a non-reversionary $9,000,000 Settlement Fund, from which class members will receive *pro rata* cash payment. Fraietta Decl. Ex. A, First Amended Class Action Settlement Agreement ("Amended Settlement") ¶¶ 1.32, 2.1. Class members with proof of purchase are eligible to receive a cash award subject to a $40 cap and *pro rata* adjustment based on claims volume. *Id.* ¶ 2.3(a). Class members without proof of purchase are eligible to receive a cash award subject to a $20 cap and *pro rata* adjustment. *Id.* Additionally, under the terms of the Amended Settlement, Defendant has agreed to reevaluate and refresh its formulations for the Premier Protein RTD shakes, review its manufacturing specifications and protocols for co-manufacturers producing the Premier Protein RTD shakes, and work with its co-manufacturers

on best practices to implement those specifications and manufacturing protocols in order to

minimize the variability of the protein content contained in the Premier Protein RTD shakes. *Id.*

¶ 2.7.

## ARGUMENT

## I.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE APPROVED

The requested fee award of $3,000,000.00, representing one-third of the common fund, is

reasonable and merits approval.  Under Federal Rule of Civil Procedure 23(h), courts may award

"reasonable attorney's fees and nontaxable costs that are authorized by law or the parties'

agreement."  Fed. R. Civ. P. 23(h).[1]  Here, the Amended Settlement between the Parties provides

that Class Counsel may petition the Court for an award up to one-third of the Settlement Fund.

Amended Settlement ¶ 3.1.

In common-fund cases such as this one, courts in the Second Circuit apply one of two fee

calculation methods – the "percentage of the fund" method or the "lodestar" method.  *See*

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  The Court has

discretion in choosing which method to employ.  *See McDaniel v. Cnty. of Schenectady*, 595

F.3d 411, 419 (2d Cir. 2010) (holding that "the decision as to the appropriate method [is left] to

'the district court, which is intimately familiar with the nuances of the case'") (quoting

*Goldberger*, 209 F.3d at 48).  "The trend in the Second Circuit is to use the percentage of the

---

[1] The requested fee award also encompasses unreimbursed litigation costs and expenses. Amended Settlement ¶ 3.1.  Reasonable litigation-related costs and expenses are customarily awarded in common fund cases and include costs such as document preparation and travel.  *See, e.g., Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) ("Class Counsel's unreimbursed expenses, including court and process server fees, postage and courier fees, transportation, working meals, photocopies, electronic research, expert fees, and Plaintiffs' share of the mediator's fees, are reasonable and were incidental and necessary to the representation of the class.").  Thus, included in the requested fee award, Class Counsel and Supporting Counsel respectfully seeks reimbursement of $29,227.80 for out-of-pocket costs and expenses in these standard categories, as well as the pre-filing commissioning of independent laboratory testing.  *See* Fraietta Decl. ¶ 51, Ex. C; Declaration of Nick Suciu III ("Suciu Decl.") ¶ 4, Ex. B; Declaration of Anne Barker ("Barker Decl.") ¶ 5, Ex. C.

fund method in common fund cases like this one, as it directly aligns the interests of the class and its counsel, mimics the compensation system actually used by individual clients to compensate their attorneys, provides a powerful incentive for the efficient prosecution and early resolution of litigation, and preserves judicial resources." *Monzon v. 103W77 Partners, LLC*, 2015 WL 993038, at *2 (S.D.N.Y. Mar. 5, 2015) (Torres, J.). In fact, the "trend" of using the percentage of the fund method to compensate class counsel is now "firmly entrenched in the jurisprudence of this Circuit." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 388 (S.D.N.Y. 2013). As the Second Circuit has stated, the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). "In contrast, the 'lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in gimlet-eyed review of line-item fee audits.'" *Id.* (quoting *Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002)). Indeed, over a decade ago, the Second Circuit described difficulties with the lodestar method:

> As so often happens with simple nostrums, experience with the lodestar method proved vexing. Our district courts found it created a temptation for lawyers to run up the number of hours for which they could be paid. For the same reason, the lodestar created an unanticipated disincentive to early settlements. But the primary source of dissatisfaction was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits. There was an inevitable waste of judicial resources.

*Goldberger*, 209 F.3d at 48-49. And as Judge Karas has noted, "courts in the Second Circuit no longer use the 'lodestar' method for computing attorneys' fees" in fee-shifting cases. *GB ex rel NB v. Tuxedo Union Free School Dist.*, 894 F. Supp. 2d 415, 427 (S.D.N.Y. 2012) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir. 2008));

*see also* Fraietta Decl. Ex. L, 1/31/18 *Taylor v. Trusted Media Brands, Inc.* Final Approval

Hearing Transcript ("*TMBI* Hearing Tr.") at 16:18-19 ("Now, the lodestar method is not

supposed to be used for computing attorneys' fees.").

Moreover, Courts in this Circuit, including this Court, routinely approve fee requests for

one-third of a common fund.  *See Zorrilla v. Carlson Restaurants Inc.*, 2018 WL 1737139, at *2

(S.D.N.Y. Apr. 9, 2018) (Torres, J.) (awarding "$6,336,666.67, or one-third of the Gross

Settlement Amount, for attorneys' fees"); *Flores v. Anjost Corp.*, 2014 WL 321831, at *8

(S.D.N.Y. Jan. 29, 2014) (Torres, J.) (awarding attorneys' fees equal to one-third of the

settlement fund); *see also Hayes v. Harmony Gold Min. Co.*, 2011 WL 6019219, at *1 (S.D.N.Y.

Dec. 2, 2011) (awarding "attorneys' fees in the amount of one third" of a $9 million settlement

fund), *aff'd* 509 F. App'x 21, 23-24 (2d Cir. 2013) (affirming fee award, and noting that "the

prospect of a percentage fee award from a common fund settlement, as here, aligns the interests

of class counsel with those of the class"); *In re Initial Public Offering Secs. Litig.*, 671 F. Supp.

2d 467, 516 (S.D.N.Y.2009) (awarding one-third of the $510 million net settlement fund); *City

of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *20 (S.D.N.Y. May 9, 2014) (awarding

33% of $15 million settlement fund); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8

(E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million settlement fund); *Willix v. Healthfirst,

Inc.*, 2011 WL 754862, at *6-7 (E.D.N.Y. Feb. 18, 2011) (awarding one-third of $7.675 million

settlement fund); *Clark v. Ecolab, Inc.*, 2010 WL 1948198, at *8-9 (S.D.N.Y. May 11, 2010)

(awarding one-third of $6 million settlement fund).  Indeed, as courts in this Circuit have noted,

fee requests for one-third of common funds represent what "reasonable, paying client[s] …

typically pay … of their recoveries under private retainer agreements." *Reyes v. Altamarea Grp.*,

2011 WL 4599822, at *8 (S.D.N.Y. Aug. 16, 2011) (citing *Arbor Hill*, 522 F.3d 182).

10

### A.   The Percentage Method Should Be Used To Calculate Fees

As aforementioned, the "trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013); *see also Monzon*, 2015 WL 993038, at *2 (same).  In contrast, the lodestar approach is more often applied in federal fee-shifting cases, particularly civil rights actions.  *See, e.g.*, *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010).  As Judge Cote has stated, the percentage method is preferred for several reasons:

> First, it relieves the court of the cumbersome, enervating, and often surrealistic process of evaluating fee petitions.  Second, it decreases plaintiff lawyers' incentive to run up the number of billable hours for which they would be compensated by the lodestar method.  And finally, it decreases the incentive to delay settlement because the fee for the plaintiffs' attorneys does not increase with delay.

*Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at *5 (S.D.N.Y. Nov. 8, 2000) (internal citations omitted); *see also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *16 (S.D.N.Y. July 27, 2007) ("From a public policy perspective, the percentage method is the most efficient means of compensating the work of class action attorneys.  It does not waste judicial resources analyzing thousands of hours of work, where counsel obtained a superior result.").

Under the circumstances of this case – wherein Class Counsel received an exceptional result for the Settlement Class early in the litigation – the Second Circuit prefers the percentage method.  *See Wal-Mart Stores, Inc.*, 396 F.3d at 121 (noting that the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation"); *Hyun v. Ippudo USA Holdings*, 2016 WL 1222347, at *3 (S.D.N.Y. Mar. 24, 2016) ("In this case, where the parties were able to settle

relatively early and before any depositions occurred … the Court finds that the percentage method, which avoids the lodestar method's potential to 'creative a disincentive to early settlement' … is appropriate.") (citing *McDaniel*, 595 F.3d at 418).  In contrast, "the lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in gimlet-eyed review of line-item fee audits." *Wal-Mart Stores, Inc.*, 396 F.3d at 121 (quotation omitted).

### B.   The Reasonableness Of The Requested Fees Is Supported By This Circuit's Six-Factor *Goldberger* Test

The Second Circuit has articulated six factors that should be considered when determining the reasonableness of a requested percentage to award as attorneys' fees:  "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  *Goldberger*, 209 F.3d at 50.  A review of these factors supports Class Counsel's fee request.

### 1.   Time And Labor Expended By Counsel

Class Counsel and Supporting Counsel have been working on this case since October 2016, when they began investigating Defendant's alleged mislabeling of the protein content of its RTD Products.  *See* Fraietta Decl. ¶ 3.  The pre-suit investigation was extensive, spanning more than nine months, and included commissioning independent laboratory testing for the actual protein content of the Products.  *Id.*  Class Counsel and Supporting Counsel also drafted the complaints, engaged in dispositive motion practice on novel legal issues, served and responded to discovery requests, conducted meet-and-confer teleconferences with defense counsel, and reviewed Defendant's document productions.  *Id.* ¶¶ 5-19.  As that was ongoing, Class Counsel and Supporting Counsel also engaged in direct communications with defense counsel, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of early resolution, and

scheduled a mediation with Mr. Quinn of JAMS San Francisco. *Id.* ¶¶ 20-21. In connection with the mediation, Class Counsel and Supporting Counsel reviewed sales figures for Defendant's RTD Products, and drafted a detailed mediation statement outlining the strengths of Plaintiff's case to help evaluate any potential settlement. *Id.* ¶ 22. Class Counsel also participated in a ten-hour mediation with Mr. Quinn, and with his help, reached the Original Settlement. *Id.* ¶ 23.

After preliminary approval of the Original Settlement was granted, Class Counsel worked diligently to collect class member identifying data from Costco and Sam's Club pursuant to subpoena. *Id.* ¶¶ 28-32. Upon receiving the data, Class Counsel worked closely with the Settlement Administrator to analyze it. *Id.* ¶ 33. That analysis led Class Counsel to identify that the retailers had produced a greater volume of data than the Parties had anticipated, thus necessitating additional notice costs, primarily due to increased postage for more direct mail. *Id.* ¶ 33. As a result, Class Counsel and Supporting Counsel renegotiated the Original Settlement in an effort to deliver more cash relief to class members, and were able to negotiate an agreement to shift the settlement from a $9 million hybrid fund, consisting of cash and product vouchers, to a $9 million all-cash fund, which delivers extraordinary monetary and injunctive relief for the class. *Id.* ¶¶ 35, 40.

Thus, the work performed by Class Counsel and Supporting Counsel to date has been comprehensive, complex, and wide ranging. This factor supports the requested fee award.

### 2.    Magnitude And Complexity Of The Litigation

"[C]lass actions have a well deserved reputation as being most complex." *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (internal citation and quotations omitted). This case was no exception, both factually and legally. This case involved multiple layers of factual complexity, including issues related to the proper measurement of

protein content.  As a result, this required extensive preliminary investigation into the protein content of Defendant's RTD Products and their labeling, including commissioning and paying for independent laboratory testing.  Fraietta Decl. ¶ 3.

The case involved complex legal issues as well.  Defendant challenged the basis of the lawsuit on constitutional grounds, arguing that the case was preempted by the FDCA, and citing case law finding preemption under similar circumstances.  *Id.* ¶ 44.  Defendant also challenged this Court's personal jurisdiction over it as to non-New York class members and claims under *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017) and similar case law.  *Id.*  And if its motion to dismiss would have been ultimately denied, Plaintiff was keenly aware that Defendant would continue to challenge liability, as well as vigorously contest the certification of a litigation class.  *Id.*

In the end, because this case involved complex factual and legal questions – including federal preemption and issues of personal jurisdiction – the magnitude and complexity of the litigation further supports the requested fee award.

### 3.    The Risk Of Litigation

This factor recognizes the risk of non-payment in cases prosecuted on a contingency basis where claims are not successful, which can justify higher fees.  *See, e.g., In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) (noting risk of non-payment in cases brought on contingency basis).  "It is well settled that class actions are notoriously complex and difficult to litigate."  *Shapiro v. JPMorgan Chase 7 Co.*, 2014 WL 1224666, at *21 (S.D.N.Y. Mar. 24, 2014) (internal citation omitted).  This case presented a substantial risk of non-payment for Class Counsel.

Class Counsel invested significant time, effort, and resources to the litigation without any compensation. Cognizant of the risk of nonpayment, Class Counsel nonetheless embarked on a fact-intensive investigation into the protein content of Defendant's RTD Products and their labeling, including commissioning and paying for independent laboratory testing. Fraietta Decl. ¶ 3. Class Counsel also filed this case despite case law finding federal preemption under the FDCA under similar circumstances, which could have been dispositive on the case. *Id.* ¶ 44. Additionally, Class Counsel also paid for and participated in a full-day private mediation. *Id.* ¶¶ 21-23. Class Counsel fronted this investment of time and resources, despite the significant risk of nonpayment inherent in this case. *Id.* ¶ 44. And, as a result of the time and capital investment required to litigate this case, Class Counsel had to forego other work, including hourly non-contingent matters, and other class action matters. *Id.* ¶ 52. Moreover, given the defenses mounted by Defendant, as well as the fairly limited history of litigation of protein under-filling cases, success on the legal issues presented by this case was far from certain. *Id.* ¶¶ 4, 19, 44. Additionally, Defendant is well-heeled with excellent counsel who would vigorously litigate every stage of the case. *Id.* ¶ 44. The fact that Class Counsel undertook this representation, despite the significant risk of nonpayment, supports the requested fee award.

### 4. The Quality Of Representation

Class action litigation presents unique challenges, and Class Counsel proved that they have the ability and resources to litigate this case zealously and effectively. In addition, Class Counsel are well-respected attorneys with significant experience litigating consumer class actions of similar size, scope, and complexity. Fraietta Decl. ¶ 59, Ex. M (Bursor & Fisher, P.A. Firm Resume); Suciu Decl. ¶¶ 6-7, Ex. C (Barbat, Mansour & Suciu PLLC Firm Resume). Indeed, Class Counsel has been recognized by courts across the country for their expertise. *See* Firm Resumes, Fraietta Decl. Ex. M; Suciu Decl. Ex. Y; *see also Ebin v. Kangadis Food Inc.*,

297 F.R.D. 561, 566 (S.D.N.Y. Feb. 25, 2014) (Rakoff, J.) ("Bursor & Fisher, P.A., are class action lawyers who have experience litigating consumer claims. … The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in five class action jury trials since 2008."); *Price v. L'Oreal USA, Inc.*, 2018 WL 3869896, at *4 (S.D.N.Y. Aug. 15, 2018) (Schofield, J.) (appointing Barbat, Mansour & Suciu PLLC as co-Class Counsel, and finding that the firm is "experienced in litigating class actions and other complex cases").

Furthermore, "[t]he quality of the opposition should be taken into consideration in assessing the quality of the plaintiffs' counsel's performance." *In re MetLife Demutalization Litig.*, 689 F. Supp. 2d 297, 362 (E.D.N.Y. 2010). Class Counsel achieved an exceptional result in this case while facing well-resourced and experienced defense counsel. *See Marsh ERISA Litig.*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement.").

Class Counsel litigated this case efficiently, effectively, and civilly. The excellent result is a function of the high quality of that work, which supports the requested fee award.

### 5. The Requested Fee In Relation To The Settlement

Class Counsel seek attorneys' fees, costs, and expenses totaling one-third of the $9 million settlement fund. As aforementioned, courts in this Circuit routinely approve fee requests for one-third of a common fund. *See supra* cases cited in Argument § I. Thus, this factor supports the requested fee award.

### 6. Public Policy Considerations

The final *Goldberger* factor is public policy. "Skilled counsel must be incentivized to pursue complex and risky claims [that protect the public on a contingency basis]." *Shapiro*, 2014 WL 1224666, at *24. As such, reasonable fee awards must be provided in order to ensure

that attorneys are incentivized to litigate class actions, which serve as private enforcement tools to police defendants who engage in misconduct. *See id.* "Attorneys who fill the private attorney general role must be adequately compensated for their efforts," otherwise the public risks an absence of a "remedy because attorneys would be unwilling to take on the risk." *Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *7 (E.D.N.Y. Nov. 20, 2012) (citing *Goldberger*, 209 F.3d at 51).

Society undoubtedly has a strong interest in incentivizing lawyers to bring complex litigation that is necessary to protect consumers from false or misleading advertising. In fact, class action litigation in this area is the most realistic means of protecting consumers from false or misleading advertising because, when individual class members seek a relatively small amount of damages, "economic reality dictates that [their] suit proceed as a class action or not at all." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974). Thus, the alternative to a class action in this case would have been no enforcement at all, and Defendant's allegedly unlawful conduct would have continued unabated. This factor thus supports the requested fee award.

### C. The Requested Attorneys' Fees Are Also Reasonable Under A Lodestar Cross-Check

A lodestar cross-check further supports the requested fee. Courts applying the lodestar method generally apply a multiplier to take into account the contingent nature of the fee, the risks of non-payment, the quality of representation, and the results achieved. *See Wal–Mart Stores, Inc.*, 396 F.3d at 121. Where the lodestar is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50; *see also Cassese v. Williams*, 503 F. App'x 55, 59 (2d Cir. 2012) (noting the "need for exact [billing] records [is] not imperative" where the lodestar is used as a "mere cross-check").

To calculate lodestar, counsel's reasonable hours expended on the litigation are

multiplied by counsel's reasonable rates.  *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); *Blum v. Stenson*, 465 U.S. 886, 897 (1984); *Parker v. Time Warner Entertainment Co., L.P.*, 631 F. Supp. 2d 242, 264 (E.D.N.Y. 2009).  The resulting figure may be adjusted at the court's discretion by a multiplier, taking into account various equitable factors.  *See Parker*, 631 F. Supp. 2d at 264; *Shapiro*, 2014 WL 1224666, at *24 ("Additionally, under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.") (internal quotations and citations omitted).

The hourly billing rate to be applied is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate."  *See Blum*, 465 U.S. at 895; *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 115-116 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation'") (alteration in original and citation omitted).  Here, the hourly rates used by Class Counsel are comparable to rates charged by attorneys with similar experience, skill, and reputation, for similar services in the New York legal market.  *See* Fraietta Decl. ¶¶ 53-57.[2]

The hours worked, lodestar fee, and expenses for each of the three firms representing the Class are set forth in the declarations of Mr. Fraietta, Mr. Suciu, and Ms. Barker, submitted herewith.  These records confirm Class Counsel's efficient billing.  For example, Class Counsel

---

[2]  The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds.  *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (recognizing "an appropriate adjustment for delay in payment – whether by the application of current rather than historic hourly rates or otherwise"); *LeBlanc-Sternberg v. Fletcher,* 143 F. 3d 748, 764 (2d Cir. 1998) ("The lodestar should be based on 'prevailing market rates' … and current rates, rather than historical rates, should be applied in order to compensate for the delay in payment.") (citation omitted).

strives to assign as much work as possible to less senior lawyers or paralegals who bill at lower hourly rates in order to minimize fees for the Class.  Approximately 61.4% of Class Counsel's hours (615.1 hours) were billed by associates or paralegals.  Fraietta Decl. ¶ 48, Ex. B; Suciu Decl. ¶ 2, Ex. A.  However, this was a complex case that involved a lot of novel legal issues, which required some involvement by more experienced lawyers.  Thus, Class Counsel's partners billed approximately 38.6% of the total hours (386.4 hours), primarily on the pre-suit investigation, developing the litigation strategy, attending mediations, and negotiating the settlement.  *See id.*

Thus, even under the optional lodestar cross check, Class Counsel's requested fees are reasonable given the unique circumstances of this case.  Specifically:

- Class Counsel obtained an exceptional settlement, which will result in class members receiving a substantial amount of money quickly.

- The settlement was obtained in an efficient manner, by experienced and qualified counsel.

- The case involved complex and novel legal issues and factual theories, which involved significant litigation risks.

- Class Counsel devised a litigation and settlement strategy that factored in the complex and uncertain nature of the case.

In total, through October 31, 2018, Class Counsel and Supporting Counsel billed 1,071.4 hours, which at their hourly rates amounts to a lodestar of $608,937.30, summarized as follows:

| Summary Of Class And Supporting Plaintiff's Counsel's Time, Lodestar And Expenses | | | |
|---|---|---|---|
| **Firm** | **Hours** | **Lodestar** | **Expenses** |
| Bursor & Fisher, P.A. | 752.8 | $413,057.50 | $6,779.02 |
| Barbat, Mansour & Suciu, PLLC | 248.7 | $159,135.00 | $1,700.00 |
| Consumer Law Group PC | 69.9 | $36,744.75 | $20,748.78 |
| **Total** | **1,071.4** | **$608,937.30** | **$29,227.80** |

The requested attorneys' fees, costs, and expenses is $3,000,000.  After reimbursement for the $29,227.80 of litigation costs and expenses, *see* Fraietta Decl. ¶ 51, Ex. C; Suciu Decl. ¶ 4, Ex. B; Barker Decl. ¶ 5, Ex. C, the remainder for the attorneys' fees is $2,970,772. Therefore, the requested fee award reflects a 4.88 times multiplier on Class and Supporting Plaintiff's Counsel's regular hourly rates.  This multiplier is well within the accepted range in this Circuit.  *See Asare v. Change Grp. of N.Y., Inc.*, 2013 WL 6144764, at *19 (S.D.N.Y. Nov. 18, 2013) ("Typically, courts use multipliers of 2 to 6 times the lodestar."); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) (approving attorneys' fees of 33% of a $4.9 million common fund, representing a 6.3 times multiplier on Class Counsel's regular hourly rates); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (approving attorneys' fees of $253,758,000, which reflected a "lodestar multiplier of just over 6"); Fraietta Decl. Ex. L, *TMBI* Hearing Tr. at 18:4-17 (approving attorneys' fees of one-third of an $8.225 million common fund, representing an 11.7 times multiplier on Class Counsel's regular hourly rates).  And as courts in this District have noted, a higher multiplier "should not result in penalizing plaintiffs' counsel for achieving an early settlement, particularly where, as here, the settlement amount was substantial."  *Beckman*, 293 F.R.D. at 482; *Hyun*, 2016 WL 1222347, at *3 ("In this case, where the parties were able to settle relatively early and before any depositions occurred … the Court finds that the percentage method, which avoids the lodestar method's potential to 'create a disincentive to early settlement' … is appropriate.") (citing *McDaniel*, 595 F.3d at 418).  Moreover, due to the potential that the Court may have found that Plaintiff's claims were preempted, Class Counsel recognized that an efficient settlement was the best result for the class members, as continued litigation could have provided the class members with no recovery at all.

Class Counsel's lodestar multiplier is also reasonable because it will decrease over time.

"[A]s class counsel is likely to expend significant effort in the future implementing the complex procedure agreed upon for collecting and distributing the settlement funds, the multiplier will diminish over time." *Parker v. Jekyll & Hyde Entm't Holdings, LLC*, 2010 WL 532960, at *2 (S.D.N.Y. Feb. 9, 2010).  Here, "[t]he fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward, also supports their fee request." *Yuzary*, 2013 WL 5492998, at *11 (quoting *McMahon v. Olivier Cheng Catering & Events, LLC*, 2010 WL 2399328, at *8 (S.D.N.Y. Mar. 3, 2010)).

"[C]ourts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Beckman*, 293 F.R.D. at 474 (citing *Hernandez v. Merrill Lynch & Co.*, 2012 WL 5862749, at *2 (S.D.N.Y. Nov. 15, 2012); *Castagna v. Madison Square Garden, L.P.*, 2011 WL 2208614, at *6 (S.D.N.Y. June 7, 2011)).  Here, the Parties acted responsibly in reaching a relatively early settlement of this case.  Class Counsel should be rewarded for achieving an exceptional settlement of this case relatively quickly.

## II.     THE REQUESTED INCENTIVE AWARD REFLECTS MR. GREGORIO'S ACTIVE INVOLVEMENT IN THIS ACTION AND SHOULD BE APPROVED

Incentive awards are common in class action cases and serve to "compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff[s]." *Reyes*, 2011 WL 4599822, at *9.  Incentive awards fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take. *Massiah*, 2012 WL 5874655, at *8.

Here, the participation of Mr. Gregorio was critical to the ultimate success of the case. *See* Fraietta Decl. ¶¶ 61-63.  Mr. Gregorio spent approximately 30 hours protecting the interests of the class through his involvement in this case. *See* Declaration of Joseph Gregorio ("Gregorio

Decl.") ¶ 10.  Mr. Gregorio assisted Class Counsel in investigating his claims, by detailing his purchase of Defendant's RTD Products and aiding in drafting the Complaint, and the amendments thereto.  *Id.* ¶¶ 3-4.  During the course of this litigation, Mr. Gregorio kept in regular contact with his lawyers to receive updates on the progress of the case and to discuss strategy.  *Id.* ¶ 5.  Further, Mr. Gregorio searched for relevant documents in his possession, custody, or control in discovery, including by performing electronic searches of his email accounts.  *Id.* ¶ 6.  Finally, Mr. Gregorio was actively consulted during the settlement process.  *Id.* ¶ 7.

On these facts, the $5,000 incentive payment is fair and reasonable.  Indeed, this Court approved incentive awards of $25,000 each for the named plaintiffs in *Flores*.  *See Flores*, 2014 WL 321831, at *10.  And, as other courts have noted, the requested $5,000 is well within the range of incentive awards approved by other courts in this Circuit.  *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 131 (S.D.N.Y. Oct. 22, 2009) (approving incentive awards of $5,000 each); *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 125 (S.D.N.Y. 2001) (noting case law supports payments of between $2,500 and $85,000).  Finally, the requested incentive award is approximately 0.05% of the Settlement Fund, which is similar to other cases.  *See, e.g.*, *In re Currency*, 263 F.R.D. at 131 (approving incentive award of approximately 0.1% of the settlement fund).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court (1) approve attorneys' fees, costs, and expenses in the amount of one-third of the settlement fund, or $3,000,000.00, (2) grant Mr. Gregorio an incentive award of $5,000 in recognition of his efforts on behalf of the class, and (3) award such other and further relief as the Court deems reasonable and just.

Dated:  November 5, 2018

Respectfully submitted,


By:     */s/ Philip L. Fraietta*
        Philip L. Fraietta

**BURSOR & FISHER, P.A.**
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY  10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  jmarchese@bursor.com
       pfraietta@bursor.com

L. Timothy Fisher (*Pro Hac Vice*)
Frederick J. Klorczyk III
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com
       fklorczyk@bursor.com

**BARBAT, MANSOUR & SUCIU PLLC**
Nick Suciu III (*Pro Hac Vice*)
1644 Bracken Road
Bloomfield Hills, MI 48302
Telephone:  (313) 303-3472
Email:  nicksuciu@bmslawyers.com

*Class Counsel*

**CONSUMER LAW GROUP PC**
Anne Barker (*Pro Hac Vice*)
306 Joy Street
Fort Oglethorpe, GA 30742
Telephone:  (706)858-0325
Email:
Abarker.consumerlawgroup@gmail.com

*Supporting Counsel*